IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANDREA STEINER, | CASE NO. 5:23-cv-99 |
| Plaintiff, | DISTRICT JUDGE BENITA Y. PEARSON |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Andrea Steiner filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court vacate and remand the Commissioner's decision.

**Procedural history**

On July 19, 2021, Steiner filed an application for Supplemental Security Income alleging a disability onset date of 1993,[1] and claiming she was disabled due to post-traumatic stress disorder (PTSD), bipolar disorder, anxiety,

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

cervicalgia, cervical degenerative disc disease, fibromyalgia, a non-ST-elevation myocardial infarction (a type of heart attack), an irregularly fast heartbeat, carpal tunnel syndrome, and peripheral neuropathy. Tr. 17, 102, 202, 230. The Social Security Administration denied Steiner's application and her motion for reconsideration. Tr. 101, 111. Steiner then requested a hearing before an Administrative Law Judge (ALJ). Tr. 141.

In June 2022, an ALJ held a hearing. Steiner and a vocational expert testified. Tr. 40–73. That month, the ALJ issued a written decision finding that Steiner was not disabled. Tr. 17–31. The ALJ's decision became final on November 14, 2022, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Steiner filed this action on January 18, 2023. Doc. 1. She asserts the following assignment of error:

> The Administrative Law Judge found that Plaintiff retained the residual functional capacity for unskilled, low-stress work, with occasional and superficial interactions. This finding lacks the support of substantial evidence because the ALJ erred in relying on the state agency reviewing opinions and erred in relying on an "improvement" with treatment of Plaintiff's mental impairments.

Doc. 6, at 1.

**Evidence**

*Personal and vocational evidence*

Steiner was born in 1974 and was 47 years old on the date she filed her application. Tr. 29. She has a high school education and no past relevant work. Tr. 29.

2

*Medical evidence*[2]

In August 2020, about a year before her application date,[3] Steiner had an intake assessment at Portage Path Behavioral Health. Tr. 606–14. Steiner's exam showed that she had rapid, pressured speech; impaired attention and concentration; and racing, tangential thoughts. Tr. 611. She was cooperative, had an appropriate affect, and a euthymic mood.[4] Tr. 611. Her insight was good and her judgment was intact. Tr. 611. The counselor diagnosed Steiner with unspecified bipolar and related disorder, unspecified anxiety disorder, and unspecified trauma- and stressor-related disorder. Tr. 612–13. Steiner began counseling and was prescribed mental health medications. Tr. 603–04.

In September 2020, Steiner was admitted to the hospital for heart palpitations. Tr. 429–30. While there, she underwent a psychological evaluation for anxiety. Tr. 425. The doctor diagnosed Steiner with PTSD, bipolar 2 disorder with major depressive episode, insomnia due to another mental health disorder, and obstructive sleep apnea. Tr. 425–26. Steiner

---

[2]   The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Steiner only challenges the ALJ's decision as to her mental impairments, so I only cite the medical evidence corresponding to those impairments.

[3]   Generally, the disability onset date is the application date in Supplemental Security Income cases. *See* Soc. Sec. Ruling 83-20, 1983 WL 31249 (Jan. 1, 1983). The ALJ found that Steiner filed her application on July 19, 2021, and considered that date the disability onset date. Tr. 17–18.

[4]   A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary, at 647 (33d ed. 2020).

3

requested a referral for eye movement desensitization and reprocessing therapy, which the doctor provided.[5] Tr. 426.

In late April 2021, while booked in the Wayne County Jail on a misdemeanor domestic violence charge, Steiner was placed on suicide watch due to making suicidal comments and taken to Liberty Center Connections for an evaluation. Tr. 914. Steiner's mental status exam findings showed that Steiner had a constricted affect and "frequent tearfulness with moments of emotional dysregulation" consistent with her reported anxious and depressed mood. Tr. 914. She denied suicidal ideation, intent, plan, or means. Tr. 914. She explained that she made suicidal statements "out of frustration and distress" but didn't mean what she said. Tr. 914. She denied a history of suicide attempts or psychiatric hospitalizations. Tr. 914. Steiner said that she was actively engaged in mental health treatment and had in her possession mental health medication. Tr. 914. The evaluator recommended that Steiner be cleared from suicide watch. Tr. 915.

On May 20, 2021, Steiner had a telehealth counseling appointment at Portage Path. Tr. 493–95. Steiner was living in a domestic violence shelter and was "very frustrated" there. Tr. 493. The counselor described Steiner as "[v]ery grandiose" when discussing her dissatisfaction with her public defender. Tr.

---

[5]     Eye movement desensitization and reprocessing therapy is a mental health therapy used to treat PTSD and other conditions. *See* https://my.clevelandclinic.org/health/treatments/22641-emdr-therapy [https://perma.cc/3QVJ-2KKT]

494. She was "[v]ery angry and frustrated" about the effects of a court order and agitated and annoyed that people weren't helping her. Tr. 494. That and her inability to garden and care for herself as she wished made Steiner "lash[] out." Tr. 494. The counselor wrote that Steiner had poor insight into her own actions. Tr. 494.

Five days later Steiner underwent another assessment at Liberty Center. Tr. 917. Steiner described her strengths: accepts feedback; adequate intelligence; articulate; capable of independence; clear thinking; good judgment; insightful; motivated for treatment; reliable; responsible; self-confident; and sociable. Tr. 917. Steiner was diagnosed with persistent depressive disorder and generalized anxiety disorder. Tr. 928. Medications she took for her mood included Buspar, Trazadone, and Lamotrigine. Tr. 923–24.

In early June 2021, Steiner had a counseling appointment at Liberty Center. Tr. 933. The counselor found that Steiner was alert and oriented, with a euthymic mood and a "broad" affect. Tr. 933. Steiner updated the counselor on her current stressors and Steiner "processed stressors effectively." Tr. 933.

The next day, Steiner had a medication management video appointment at Portage Path. Tr. 487. Steiner reported that she was "not good" and described "issues with the staff at the shelter." Tr. 488. She was taking her medications. Tr. 488. Steiner said that she was utilizing available community resources for help with disability and employment. Tr. 488. She advised the counselor that she would be changing her mental health care to Liberty Center

5

because it was closer to her.[6] Tr. 488. On exam, Steiner was well-groomed and oriented. Tr. 489. She had circumstantial and clear speech, a racing thought process, intact thought associations and content, poor insight, and fair judgment. Tr. 489. Steiner had normal and intact memory and good attention and concentration with minimal distractibility. Tr. 489. She had severe anxiety and severe depression. Tr. 489. The provider assessed Steiner's bipolar and anxiety disorders as "worsening" and Steiner's trauma disorder as "stable or improved." Tr. 490. Steiner's medications were continued. Tr. 490.

In mid-June 2021, Steiner had a counseling appointment at Liberty Center and Steiner's records there were updated. Tr. 935.

In late June 2021, Steiner had a video counseling appointment at Portage Path. Tr. 484. Steiner expressed relief that she was in the process of getting an apartment. Tr. 485. A note states that Steiner said that she "[r]ecently had a new heart related symptom that she blame[d] on stress; says that she called an ambulance and was checked out and the EKG and the bloodwork are both normal." Tr. 485. The counselor commented that Steiner "continues to demonstrate very poor insight into how her emotional states influence her physical health." Tr. 485. Steiner's exam findings showed an

---

[6]    A treatment note indicates that Steiner referred to Liberty Center as "OneEighty." Tr. 488. In her brief, Steiner asserts that those two names are the same entity, which underwent a name change. Doc 6, at 4, n3. For clarity, I refer to the entity as Liberty Center.

6

anxious and depressed mood, logical thoughts, and fair insight and judgment. Tr. 485.

In early August 2021, Steiner went to Liberty Center and stated that she was "in crisis and needed to talk with her counselor" Tr. 951. Steiner's counselor and the manager of the shelter where Steiner lived joined the session. Tr. 951. Steiner was tearful and upset about many issues at the shelter, including problems Steiner had with her roommate. Tr. 951. The group "attempted to problem-solve" but Steiner "could not be pleased and left angrily." Tr. 951.

In early September 2021, Steiner had a counseling session at Liberty Center. Tr. 1061. Steiner continued to report issues at the shelter and said that she was moved to her own room after a fight with her roommate. Tr. 1061. She received her housing voucher the day before the visit and was going to look at an apartment the next day. Tr. 1061. She was earning money doing gardening work for others. Tr. 1061. A week later, Steiner reported that she found an apartment. Tr. 1063. She said that things were "looking up for her" and that her living situation had contributed to her increased anxiety. Tr. 1063.

Meanwhile, Steiner had gone to the emergency room for heart palpitations and chest pressure. Tr. 973. Steiner's mental status exam was "grossly normal." Tr. 977.

In late October 2021, Steiner had a counseling appointment at Liberty Center. Tr. 1074. Steiner had moved into her apartment. Tr. 1074. She had

been drinking "a lot" due to stress that began when she lived at the shelter; "The Shelter drove [her] to drink." Tr. 1074. Steiner said that she believed that the shelter installed a camera in the vent in the bedroom of her new apartment. Tr. 1074.

On November 3, 2021, Steiner had a counseling appointment at Liberty Center. Tr. 1570. Steiner reported that she was "struggling with employment hours and need[ed] more work." Tr. 1570. She also described legal issues, her situation with her ex-husband, and the fact that she was "still drinking." Tr. 1570. The counselor recommended that Steiner see a psychiatrist for "further evaluat[ion]." Tr. 1570.

On November 17, Steiner told her counselor that she had "a long history of losing friends due to her inability to appropriately communicate with others and … [f]lipping out on people." Tr. 1572. She was teary-eyed and said that she thought that people were always against her. Tr. 1572. The counselor again "highly recommended" a psychiatric evaluation. Tr. 1572. On November 22, Steiner reported "upsetting" "family information." Tr. 1574. Steiner had been drinking "a lot" and hadn't participated in hobbies due to her "depressed feelings" and physical limitations. Tr. 1574. The counselor noted that Steiner had "contacted the appropriate resources pertaining to employment and finances" and that Steiner had a psychiatry evaluation scheduled for the next day. Tr. 1574.

The next day, Steiner virtually saw a licensed social worker at the Cleveland Clinic for an initial psychiatric evaluation. Tr. 2529. Steiner reported "a number of life problems, which has caused her to drink which is causing her serious problems and [she] need[ed] her medications adjusted." Tr. 2531. Steiner said that she felt emotionally unstable and had delusions about a camera in the vent of her apartment. Tr. 2531. She wasn't sure how much her symptoms were caused by her "heaving drinking." Tr. 2531. On exam, Steiner was oriented and had appropriate eye contact. Tr. 2532. Her demeanor was "[a]ppropriately interactive," her speech was appropriate, and she had normal motor activity. Tr. 2532. Steiner reported a depressed mood and she had a full affect. Tr. 2532. Her thought process was circumstantial and her associations were normal. Tr. 2532. She had passive suicidal ideation, delusions, issues with long-term memory, and fair insight and judgment. Tr. 2532–33. The provider offered Steiner alcohol rehabilitation counseling for alcohol abuse, which Steiner agreed to. Tr. 2533. The provider diagnosed bipolar 2 disorder, generalized anxiety disorder, and, provisionally, an alcohol use disorder. Tr. 2533.

On November 29, 2021, Steiner saw her counselor at Liberty Center. Tr. 1576. Steiner reported that alcohol treatment had been recommended but that she couldn't afford the gas needed to drive to the treatment clinic. Tr. 1576. The Cleveland Clinic hadn't returned her call and she agreed with the counselor's suggestion that the counselor contact the Clinic for her. Tr. 1576.

9

Steiner said that her disability application had been denied and she was "very teary-eyed" during the counseling session. Tr. 1576. She stated that her thoughts of past trauma and her health problems "prohibit[ed] her from living the life that she desire[d] and it ke[pt] her from working." Tr. 1576.

In mid-December 2021, Steiner told her counselor that she was recovering from Covid-19 and had stopped drinking. Tr. 1588. Steiner expressed concern that she wasn't working and said that she was "immature" and didn't want to work. Tr. 1588. She reported a history of "always being late to work" because of "'[s]tupid things' like having a bad hair day … [and] meltdowns if things did not go right in the morning." Tr. 1588.

In mid-January 2022, Steiner saw Cleveland Clinic psychiatrist Eleanor Stein, M.D. Tr. 2506. Dr. Stein continued Steiner's prescriptions for Lamictal, Trazodone, and Atarax and increased Buspar. Tr. 2506. Dr. Stein contacted the intensive outpatient treatment group to schedule Steiner for a virtual diagnostic assessment. Tr. 2506.

In early February 2022, Steiner was virtually evaluated by a social worker from the intensive outpatient treatment group. Tr. 2446. Steiner reported that she was going through a divorce, which was "the biggest issue." Tr. 2446. The night before the appointment she started drinking again after having been sober for a month. Tr. 2446. The provider wrote that Steiner was referred to the intensive outpatient treatment program for her history of depression, past abuse, and recent alcohol abuse. Tr. 2454. He found that

10

Steiner had suicidal thinking and appeared emotionally labile. Tr. 2454. He referenced Steiner's domestic violence charge, upcoming court appearance, and Steiner's physical distance from the program site, and determined that Steiner needed more social services than the intensive outpatient treatment program could provide. Tr. 2454. The social worker stated that he would provide Steiner with resources in her area. Tr. 2454.

About two weeks later, Steiner followed up with Dr. Stein. Tr. 2398. Steiner reported that her mood had improved slightly since her last visit, but she had started drinking again. Tr. 2398. She was stressed about her legal issues and on track to begin intensive outpatient treatment at a facility near her home. Tr. 2398. She had just been hired for a new job. Tr. 2398. Steiner reported some days of passive suicidal ideation and discussed her difficulty relating to people and regulating her emotions. Tr. 2398. Dr. Stein discussed Steiner's "strong h[istory]" of trauma and explained how that can cause Steiner's symptoms. Tr. 2398. On exam, Steiner had an anxious mood, restricted affect, passive suicidal ideation, and was otherwise normal. Tr. 2402–03. Dr. Stein rated Steiner's interval progress as "slightly improved." Tr. 2398. She diagnosed Steiner with complex PTSD and secondary dependent and borderline personality traits and assessed a global assessment of functioning score of 41 to 50.[7] Tr. 2403. Dr. Stein wrote:

---

[7]     Global Assessment of Functioning (GAF) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See American Psychiatric Association: Diagnostic & Statistical*

> [Steiner] has a strong history of trauma, both sexual and physical, and her patterns of poor distress tolerance and difficulty relating to others started in childhood. She demonstrates emotional instability and mood lability, struggles with abandonment, has periods of impulsive behavior (without goal directed activity or decreased need for sleep), difficulty controlling intense emotions, unstable interpersonal relationships, transient stress-related dissociative and paranoid thinking which all points towards the most likely diagnoses being borderline personality disorder in the setting of complex PTSD from her traumatic upbringing.

Tr. 2403. Dr. Stein continued Steiner's medications, added Zoloft, and opined that Steiner would "greatly benefit" from an intensive outpatient program. Tr. 2403.

On February 21, 2022, Steiner started an intensive outpatient program at Wooster Community Hospital. Tr. 1600. She reported being angry and irritable "for several years" and complained of worsening symptoms in "recent months," including daily "fits" or "meltdowns" when feeling overwhelmed. Tr. 1608. She reported binge drinking once a week during the six months before the appointment. Tr. 1608. Steiner said that she was unemployed "because her

---

*Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id*. In 2013, the Fifth Edition of the Diagnostic & Statistical Manual of Mental Health Disorders was published and did not include the GAF. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013, at 16.

work used to be seasonal," but she had a new, part-time job at a retirement home that she was about to start. Tr. 1608. Steiner described feeling down, sad, and hopeless and having crying spells. Tr. 1608. She had low motivation, low energy, and some decreased concentration. Tr. 1608. She reported manic behavior every two to three months and denied panic attacks. Tr. 1608–09. On exam, Steiner was cooperative but "somewhat defensive at times." Tr. 1610. Her eye contact was fair but she often looked away. Tr. 1610. Her speech was normal and fluent with no pressure. Tr. 1610. Her mood was depressed and her affect was "full and mildly irritable." Tr. 1610. Steiner's thought process was goal-directed and organized, with fleeting passive suicidal ideation. Tr. 1610. Steiner had average intelligence, intact judgment, limited insight, and high impulsivity. Tr. 1611. The doctor diagnosed Steiner with bipolar 2 disorder, severe and chronic PTSD, rule-out alcohol use disorder, and "strong cluster B traits." Tr. 1611.

A week later, Steiner discharged herself from the intensive outpatient program because she "plan[ned] to voluntarily admit herself to an inpatient hospital." Tr. 1600. That day, Steiner went to the emergency room for suicidal ideation. Tr. 2274, 2297. The next day, March 1, she was admitted. Tr. 1683. Steiner said that she had been thinking of overdosing on pills and writing goodbye letters to each person in her life. Tr. 1683. She was going through a divorce and reported being homeless for seven months before getting an apartment of her own. Tr. 1683. On exam, Steiner was cooperative, alert and

13

oriented, emotional, and appeared hopeless and depressed. Tr. 1683. She had linear and organized thoughts, slow speech, intact memory, and a full affect. Tr. 1683. Steiner stated that she was a seasonal, self-employed gardener and that she was "[c]urrently unemployed and looking for year-round employment." Tr. 1684.

A March 3 progress note states that Steiner was playing cards with peers and presented with a bright affect. Tr. 1689. Steiner said that her mood and sleep had improved since admission. Tr. 1689. A discharge plan was discussed and Steiner was to continue outpatient services at Anazao Community Partners. Tr. 1689, 2578. Steiner indicated that she worked with a job coach and was supposed to start a new job the day she was admitted. Tr. 1740. The next day Steiner was discharged, diagnosed with major depressive disorder, severe, without psychotic features; PTSD; and borderline personality traits. Tr. 1704. Changes were made to her medications, including an increase in Sertraline, which she tolerated well without side effects. Tr. 1705. Steiner's mood and affect had improved, with no suicidal ideation or evidence of disorganized behavior. Tr. 1705. On mental status exam at discharge, Steiner was oriented, had an "optimistic" mood and appropriate affect, fair insight and judgment, and intact memory. Tr. 1707. She identified ways to increase socialization, including further intensive outpatient treatment. Tr. 1688.

On March 9, 2022, Steiner had an initial comprehensive assessment at Anazao Community Partners. Tr. 2578. Steiner reported struggling with

14

trauma and recent suicidal ideation, which was caused by increased crying, feeling unusually angry, having heart palpitations, and increased intrusive thoughts about being alone. Tr. 2579, 2589. She stated that she had irritability, angry outbursts, trouble concentrating, hypervigilance, and detachment or estrangement from others. Tr. 2580. Steiner said that she had a full-time job at a retirement and rehabilitation center and was satisfied with it. Tr. 2583. She started that job "last week" and explained that it was "going okay so far" but it was stressful "because of her boss/coworkers and because she ha[d] to remember a lot." Tr. 2583. On exam, Steiner was alert and oriented and had a "clean appearance." Tr. 2584. She made good eye contact and had fair concentration, with occasional flights of ideas. Tr. 2584. Her speech was rapid, often talking at length, and her immediate, short-term, and long-term memory were intact. Tr. 2584. Steiner had an appropriate affect, an irritable and anxious mood, "partial" judgment, and fair insight. Tr. 2584–85. She was diagnosed with PTSD, bipolar 2 disorder, and generalized anxiety disorder with panic attacks. Tr. 2587.

On March 17, Steiner returned to Anazao to complete her assessment. Tr. 2593. Steiner said that her new job was stressful because she found it hard to remember things and she worried about having a panic attack. Tr. 2593. The provider described Steiner as presenting with anxiety and sadness. Tr. 2594. At a telehealth visit on March 24, Steiner said that she felt tired after her shifts at work and wasn't sure how long she could "keep up with things."

Tr. 2598. She felt like her supervisors didn't communicate well, which stressed her out. Tr. 2598. She was two weeks into her intensive outpatient mental health program, which she "like[d] so far" and which was helping. Tr. 2598. Steiner became upset and tearful during the session and became calm and felt better after the provider helped her with breathing exercises. Tr. 2598–99.

On March 31, 2022, Steiner had a counseling session at Anazao. Tr. 2600. She was fired from her job because of her pending domestic violence charge. Tr. 2600. The provider described Steiner as anxious, irritable, and sad, and wrote that Steiner had made steady progress. Tr. 2601.

On April 7, 2022, Steiner returned to Anazao and reported that she had been using her coping techniques, walking, and using breathing and mindfulness exercises, which were helpful. Tr. 2602. She was upset that her intensive outpatient program was soon ending, but she was planning to start eye movement desensitization and reprocessing therapy. Tr. 2602. She had been to court that morning and the domestic violence charge against her was dropped. Tr. 2602. Steiner hoped to get a cleaning job she had applied for. Tr. 2602. She showed symptoms of anxiety at the visit. Tr. 2603. On April 14, Steiner reported that she continued to use self-care to manage her symptoms and felt "pretty well" and "really good." Tr. 2604–05. She was walking in three-mile increments, doing arts and crafts again, and was still looking for work and planned to re-start her gardening business that spring. Tr. 2604.

16

On April 21, Steiner went to Anazao and stated that she was doing well and "coping." Tr. 2608. She graduated from her intensive outpatient program and was proud of her progress. Tr. 2608. On April 28, Steiner said that she was trying to look out for herself, going on walks and using other "self-care" techniques. Tr. 2612. At all of those April visits, the provider noted that Steiner had made steady progress. Tr. 2603, 2605, 2609, 2613.

Meanwhile, Steiner completed her intensive outpatient treatment program at Wooster Community Hospital on April 20. Tr. 1893–94. The doctor wrote that Steiner's attendance was consistent and Steiner "remained attentive and actively engaged [as evidenced by] taking notes throughout the various sessions and providing input in both group and individual sessions." Tr. 1893. She completed her treatment goals and no longer met the criteria for intensive outpatient level of care. Tr. 1893. The doctor recommended that Steiner continue with outpatient treatment at Anazao, focusing on communication, emotional regulation skills, healthy boundaries, and ongoing stress management skills as Steiner continued to work through her divorce. Tr. 1894. The doctor wrote that Steiner was linked to continued medication management at the Cleveland Clinic and aftercare group therapy at Wooster Community Hospital. Tr. 1894.

On May 5, 2022, Steiner returned to Anazao and reported that she was "generally doing well the last week." Tr. 2614. She had been chatting with a new friend online and meeting up with another friend. Tr. 2614. She was going

17

for regular walks, taking care of herself, and listening to meditation tapes. Tr. 2614. Steiner presented with anxiety, but the provider noted that she had made steady progress. Tr. 2615. On May 12, Steiner said that she was spending time with a new boyfriend. Tr. 2616. She had a "bad interaction" with her husband the morning of her visit but was "doing better." Tr. 2616. She was again noted to be anxious with steady progress. Tr. 2617.

On May 26, Steiner told the provider at Anazao that she had started seeing her husband again and noticed an increase in her mental-health symptoms, including nightmares about him. Tr. 2618. She felt tired but attributed it to physical issues, not an increase in her depressive symptoms. Tr. 2618. She still felt motivated. Tr. 2618. She presented with anxiety and her progress was described as "stable." Tr. 2619.

*State agency opinions*[8]

In September 2021, Aracelis Rivera, Psy.D., reviewed Steiner's record. 109. As for Steiner's residual functional capacity (RFC),[9] Dr. Rivera opined

---

[8]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's

that Steiner could perform simple, routine, one- to two-step tasks and some multi-step, three- to four-step tasks "that are not fast paced in nature." Tr. 108. Steiner could work in a static environment without strict production demands. Tr. 108. In December 2021, Karla Delcour, Ph.D., reviewed Steiner's record and agreed with Dr. Rivera's findings. Tr. 120.

*Hearing testimony*

Steiner, who was represented by counsel, testified at the telephonic administrative hearing held in June 2022. Steiner stated that she lived alone in an apartment. Tr. 49. She didn't keep up with household chores like dishes and laundry because she "just hate[s] it," she is too depressed, lacks motivation, and can't concentrate on one thing. Tr. 50. In essence, she is "too overwhelmed." Tr. 50. She has a driver's license and can drive, but she doesn't drive because she doesn't have a car. Tr. 50. To travel to the store and appointments Steiner uses a taxi. Tr. 51.

At the time of the hearing, Steiner was a self-employed gardener and worked two days for eight hours total per week. Tr. 51. When asked what prevented her from working full-time, Steiner said that she gets overwhelmed. Tr. 52. Also, she has children. Tr. 52. So she "can't do anything when [she] come[s] home." Tr. 52. Just working part time left her tired and overwhelmed,

---

"description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

which caused her to become unstable, have mood swings, and become angry. Tr. 52. Her "emotional response … [is] exaggerated." Tr. 52.

When asked about her bipolar disorder, Steiner explained that she is primarily in the depressive phase. Tr. 52. She has daily crying spells. Tr. 53. As for mood swings, as long as she isn't "pushed too hard, [she's] fine." Tr. 53. At the time of the hearing, Steiner stated that she was "fine right now, most of the time," because her gardening client "caters" to Steiner and lets her take breaks and stop working when she needs to. Tr. 53. That stress-free environment at work "has made a huge difference." Tr. 53.

Steiner doesn't often experience anger anymore—her outbursts were triggered by her marital problems. Tr. 53. At the time of the hearing, she had panic attacks about once or twice a month. Tr. 54. When she lived for seven months in the shelter she had them "regularly" and had to take her medication to settle her nerves. Tr. 54. Without medication, her panic attacks last "a while"—over an hour. Tr. 54. Steiner said that her behavioral health counseling taught her "numerous skills," which she used "a good portion of the time." Tr. 54. But sometimes she gets "flooded with emotion and can't … remember what to do." Tr. 54.

Steiner stated that her PTSD caused nightmares. Tr. 54. The frequency of nightmares increased when she had contact with her husband. Tr. 54. She used to have them once a week and sometimes two or three times a week. Tr. 54–55. She has difficulty sleeping and can't resume sleeping once she wakes

up because she's "stuck in that dream." Tr. 55. Often, she takes "a secondary sleeping medication." Tr. 55. Steiner takes ten medications. Tr. 55. Other than "really bad dry mouth," she hasn't noticed any side effects. Tr. 55. She has no one to remind her to take her medications and some days she forgets, or she'll take it late and then have to stay up later to spread the medications far enough apart. Tr. 56.

Steiner continues to "go to aftercare" for her behavioral health. Tr. 56. It's a group class to learn more skills and "go more in depth into those things." Tr. 56–57. She also needs a specialized trauma therapist. Tr. 56. Once her divorce is final, Steiner plans to start eye movement desensitization and reprocessing therapy. Tr. 56. When asked about her history of alcohol use, Steiner said that she drinks about three drinks once or twice a month. Tr. 57.

Steiner described an example of her heightened sensitivity to things: she took a taxi home from her therapy session, which ran 12 minutes over, so the taxi driver had been waiting for her and was "very abrupt and rude and it about made [Steiner] cry." Tr. 62. Situations like that can often affect her for the rest of the day. Tr. 62.

Steiner said that she struggles "a lot with paperwork" and that her case manager was going to help her complete paperwork for child and family services that was past due. Tr. 63. Steiner described as she testified the papers "strewn all over" the coffee table, the floor, and the dining room table. Tr. 63. She procrastinated about going to the grocery store. Tr. 64.

In addition to nightmares, Steiner stated that she had flashbacks. Tr. 64. Sometimes she recovers quickly from them and gets back to "the task at hand" but when she is tired, she struggles to use her coping skills. Tr. 64. When again asked if she could perform a job that required her to work eight hours a day, five days a week, Steiner said that it would be hard on her to work that long because of the "sheer exhaustion and what that does to [her] emotionally." Tr. 65. And that would negatively affect anything else that she would have to deal with outside work. Tr. 65.

The ALJ confirmed with the vocational expert that Steiner had no past relevant work. Tr. 68. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Steiner could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 68–69. The vocational expert answered that such an individual could perform the following jobs: routing clerk, merchandise marker, and dispatcher. Tr. 69. The vocational expert also stated that a typical employer would permit no more than one unscheduled or unexcused absence a month. Tr. 70.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since July 19, 2021, the application date (20 CFR 416.971 *et seq*.).
>
> 2. The claimant had the following severe impairments: Cervical degenerative disc

22

disease/spondylosis/stenosis with radiculopathy; Lumbar degenerative disc disease; Right De Quervain's tenosynovitis and arthritis of carpometacarpal (CMC) joint of right thumb status post right 1st CMC arthroplasty; Asthma; Obstructive sleep apnea; Obesity; Bipolar disorder, depressive disorder/dysthymic disorder and mood disorder; Anxiety disorder; Borderline personality disorder; Post-traumatic stress disorder (PTSD); Attention deficit hyperactivity disorder (ADHD); and Substance-related disorder and alcohol use disorder/abuse. (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can never climb ladders, ropes, or scaffolds. She can frequently kneel and occasionally stoop, crouch, crawl, and climb ramps and stairs. She can frequently reach with the bilateral upper extremities and frequently handle and finger with the right upper extremity. The claimant must avoid concentrated exposure to extreme cold, extreme heat, humidity, vibrations, and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving. She can perform simple, routine, and repetitive tasks, but cannot perform tasks which require a high production rate pace (such as assembly line work), and can respond appropriately to occasional change in a routine and relatively static work setting. The claimant can interact on an occasional basis with coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no

23

group, tandem or collaborative tasks, and no management, direction or persuasion of others.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born [i]n … 1974 and was 47 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since July 19, 2021, the date the application was filed (20 CFR 416.920(g)).

Tr. 20–31.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

24

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.
§ 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a
disability determination:

> 1.  Is the claimant engaged in substantial gainful
>     activity? If so, the claimant is not disabled.
>
> 2.  Does the claimant have a medically
>     determinable impairment, or a combination of
>     impairments, that is "severe"? If not, the
>     claimant is not disabled.
>
> 3.  Does the claimant's impairment meet or equal
>     one of the listed impairments and meet the
>     duration requirement? If so, the claimant is
>     disabled. If not, the ALJ proceeds to the next
>     step.
>
> 4.  What is the claimant's residual functional
>     capacity and can the claimant perform past
>     relevant work? If so, the claimant is not
>     disabled. If not, the ALJ proceeds to the next
>     step.
>
> 5.  Can the claimant do any other work
>     considering the claimant's residual functional
>     capacity, age, education, and work
>     experience? If so, the claimant is not disabled.
>     If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d
417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the
burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden
shifts to the Commissioner at step five "to prove the availability of jobs in the
national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Steiner argues that substantial evidence doesn't support the ALJ's RFC finding that Steiner can perform unskilled, low-stress work. Doc. 6, at 12. She alleges that the ALJ erred when he found persuasive the state agency reviewers' opinions. *Id.* at 13. This is so, Steiner asserts, because (1) the ALJ didn't "explicitly analyze their [RFC] determinations" and (2) their opinions were based on an incomplete record. *Id.* at 13.

As an initial matter, state agency reviewers commonly base their opinions on an incomplete record. *See, e.g., Jones v. Colvin*, No. 5:13-cv-1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12, 2014) ("[b]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.") (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3rd Cir. 2011)). So long as the ALJ considered the subsequent evidence and "took into account any relevant changes in [the claimant's] condition," there is no error in the ALJ's reliance upon the state

agency reviewers' opinions. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32

(6th Cir. 2009). Here, the ALJ considered evidence post-dating the state agency

reviewers' opinions,[10] Tr. 26–27, so procedurally there is no error. *See McGrew*,

343 F. App'x at 32.

But substantively, the ALJ didn't sufficiently explain his conclusions

about that later evidence. He didn't sufficiently explain his conclusions about

the earlier evidence in the record, either. The ALJ's failure to do so is error.

In his decision, the ALJ summarized the medical evidence. Tr. 25–27.

Then the ALJ considered the only medical opinion evidence in the record:

> State Agency psychological consultants found that the claimant had moderate limitations concentrating, persisting, or maintaining pace, along with adapting or managing oneself with no limitations in the other paragraph B criteria (2A; 4A). I find such assessments persuasive in general because the record confirmed that the claimant had ongoing mental limitations that restricted her as the consultants described. However, the claimant's social isolation, anxiety, and mood symptoms necessitated that she have only occasional and superficial interactions with others.

Tr. 28. The ALJ's RFC assessment included the limitations assessed by the

state agency reviewers and the interactive restrictions that the ALJ added. Tr.

24. But in the above-quoted passage, in which the ALJ cites the wrong portion

---

[10]    The state agency reviewers' opinions were issued in September and December 2021.  Tr. 109, 120.

of the state agency reviewers' opinions,[11] the ALJ didn't explain *why* he credited the opinions or what the "ongoing mental limitations that restricted [Steiner] as the consultants described" were. And the ALJ's summary of the evidence, Tr. 25–27, is also unenlightening because the ALJ summarily detailed the evidence without drawing sufficiently explained conclusions from it.

The only section of the ALJ's decision in which the ALJ provided insight into his decision came near its end, when the ALJ evaluated Steiner's reported symptoms and concluded:

> In terms of her mental symptoms, the claimant had ongoing mood and anxiety symptoms throughout the relevant period. Her condition appeared relatively stable during the early portion of the relevant period but she had increased symptoms in early 2022, leading to a brief hospitalization followed by an intensive outpatient treatment program. However, the claimant's condition improved over time with treatment. At the balance of the exams, she had generally appropriate appearance and behavior, adequate judgment, and intact cognitive functioning. Accordingly, she could perform simple tasks in the static setting of the residual functional capacity.

Tr. 29. Steiner argues that the ALJ's characterization of the evidence in this passage isn't accurate or supported by substantial evidence. Doc. 6, at 14. I agree.

---

[11]     The ALJ's reference to the "paragraph B criteria" is a step three finding, not the RFC finding. *See* Tr. 105, 115–16.

Start with the ALJ's finding that Steiner's condition "appeared relatively stable during the early portion of the relevant period." Tr. 29. The ALJ cites no evidence to support that statement. Earlier in his decision, the ALJ summarized the early portion of the evidence as follows:

> The record reflects that the claimant had a history of several conditions predating the application date in July 2021, including asthma, obstructive sleep apnea, anxiety, depression, bipolar disorder, posttraumatic stress disorder, obesity, and degenerative disc disease (1F; 2F; 5F; 17F). During the summer and fall of 2021, the claimant had ongoing mental health treatment where she noted stress living in a shelter (9F; 14F). She was tearful and distressed about her strained relationship with her husband (9F/36).

Tr. 25.

As Steiner points out, the ALJ omits the following facts. In April 2021, Steiner was on suicide watch while in jail. Doc. 6, at 14 (citing Tr. 914–16). In May, a counselor described Steiner as "very grandiose," angry, and agitated. Steiner had poor insight and reported lashing out at others. Doc. 6, at 14 (citing Tr. 914, 494). In June, a counselor assessed Steiner's bipolar and anxiety disorder as "worsening." Doc. 6, at 14 (citing Tr. 490). In August, Steiner saw her counselor reporting that she was "in crisis," "tearful and upset" about the conditions at the shelter she lived in. A group of counselors suggested coping skills but Steiner "could not be pleased and left angrily." Doc. 6, at 15 (citing Tr. 951–52). And in October, Steiner complained to a counselor that the shelter had put a camera in the vent of her new apartment, Tr. 1074, which Steiner

later believed was a product of "delusional thinking," Tr. 2531. I find persuasive Steiner's assertion that "[i]t is not clear what evidence from the early portion of the relevant period showed [Steiner's] symptoms were stable. The evidence appears to show the opposite."[12] Doc. 6, at 15.

Moreover, it's not clear what the ALJ meant by *relatively stable*. The "term 'stable' in the disability context does not describe the severity of an impairment." *Durden v. Saul*, No. 1:19-cv-2280, 2020 WL 5123148, at *9 (N.D. Ohio Aug. 13, 2020), *report and recommendation adopted*, No. 1:19-cv-2280, 2020 WL 5106796 (N.D. Ohio Aug. 31, 2020); *Kiefer v. Comm'r of Soc. Sec.*, No. 5:13-cv-679, 2014 WL 66717, at *5 (N.D. Ohio Jan. 8, 2014) ("the observation that Kiefer was 'stable' is of rather limited utility in the disability context.") (citing cases). And the ALJ doesn't indicate what the term *stable* is *relative to*. If the ALJ meant *stable* in the sense that Steiner's condition hadn't *worsened*, the ALJ doesn't state the relevance of that finding. For instance, one can't tell if the ALJ meant that Steiner could perform work in the summer and fall of 2021 with the restrictions in his RFC assessment before her condition worsened in early 2022.

That problem permeates the remainder of the ALJ's summary of Steiner's condition. The ALJ wrote that Steiner had "increased symptoms in

---

[12]     While much of the evidence Steiner cites is technically before her disability onset date of July 2021, the evidence provides a baseline for Steiner's condition in July 2021 and the ALJ's statement that Steiner's condition "appeared relatively stable during the early portion of the relevant period." Tr. 29.

early 2022, leading to a brief hospitalization followed by an intensive outpatient treatment program. However, the claimant's condition improved over time with treatment." Tr. 29. It's not clear if the ALJ meant that Steiner's condition *improved over time* after Steiner was hospitalized and completed her intensive outpatient treatment program. It would seem not, since Steiner completed her program in late April 2022, Tr. 1893–94, just six weeks before the administrative hearing, Tr. 40. But the ALJ couldn't have meant *improved over time* to cover the entire period at issue, because the ALJ found that Steiner's symptoms *worsened* during the relevant period. It's also possible that the ALJ believed that at the end point—June 2022—Steiner's conditions overall had improved from where Steiner started off in July 2021, when the ALJ found that her condition was *relatively stable*. But that brings one back to question what the ALJ meant by *relatively stable*. All told, the ALJ's reliance upon relational terms, without defining any of them, renders unreviewable the ALJ's conclusion about the severity of Steiner's condition.

That leaves the ALJ's finding that "[a]t the balance of the exams, [Steiner] had generally appropriate appearance and behavior, adequate judgment, and intact cognitive functioning." Tr. 29. The Commissioner, too, relies on the fact that the ALJ cited Steiner's objective exam findings to discount the severity of Steiner's alleged symptoms. Doc. 8, at 12 (citing Tr. 29). But an ALJ can't rely only on objective medical evidence to discount the severity of a claimant's alleged symptoms. *See* 20 C.F.R. 416.929(c)(2) ("we will

32

not reject [a claimant's] statements about the intensity and persistence of …
symptoms … solely because the available objective medical evidence does not
substantiate [a claimant's] statements."); Soc. Sec. Ruling 16-3p, 2017 WL
5180304, at *5 (Oct. 25, 2017). Because the ALJ's summary conclusion about
Steiner's condition is faulty, as explained above, the ALJ's sole reliance on
objective exam findings isn't proper. *See* Soc. Sec. Ruling 16-3p, 2017 WL
5180304, at *5. The case the Commissioner cites, *Tucker v Comm'r of Soc. Sec.*,
775 F. App'x 220 (6th Cir. 2019), is inapposite because in *Tucker*, the ALJ also
cited the claimant's activities of daily living to discount the claimant's
symptoms. Doc. 8, at 12; *Tucker*, 775 F. App'x at 224. Here, the ALJ offered no
other proper, alternative findings.

The Commissioner asserts that the ALJ considered additional factors,
such as "referenc[ing] [Steiner's] work activity during the period for which she
alleged disability." Doc. 8, at 12–13 (citing Tr. 27). The Commissioner then
cites other portions of the record showing that Steiner was working part-time,
"alluded to continued work again," and "continued to look for new jobs." Doc.
8, at 13. The Commissioner cites legal authority stating that an ALJ "properly
consider[s] [a] plaintiff's ability to maintain part-time employment as one
relevant factor in determining whether [the claimant] was disabled." *Id.* (citing
*Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013)). While it
is true that the ALJ referenced Steiner's work activity, Tr. 27, the ALJ didn't
draw any conclusions from it or explain how he found it to be relevant. So if

33

the ALJ relied on Steiner's work activity as a reason to find that Steiner was not disabled, he didn't say so. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself, and not based on appellate counsel's post hoc rationalization[s]") (internal quotation marks and citations omitted).

The Commissioner complains that Steiner "simply seizes on one paragraph in the decision, disregarding the remainder of the decision. A review of this paragraph indicates it was merely meant to be a short summary of the conclusion based on the evidence discussed before it." Doc. 8, at 13. The problem, however, is that the "one paragraph …. merely meant to be a short summary of [the ALJ's] conclusion" is the only portion of the ALJ's decision in which the ALJ provided an analysis showing reasons for his conclusion. The ALJ's reasons aren't sufficiently explained, so one can't tell whether the ALJ's conclusions are supported by substantial evidence. On remand, the ALJ will have an opportunity to explain his conclusions.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be vacated and remanded for proceedings consistent with this opinion.

Dated: August 16, 2023

       */s/ James E. Grimes Jr.*
       James E. Grimes Jr.
       U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).